In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2777

DAVID ARREDONDO,

*Petitioner-Appellant*,

*v.*

PETER HUIBREGTSE, Warden,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05-C-559—**Lynn Adelman,** *Judge*.

ARGUED MAY 28, 2008—DECIDED SEPTEMBER 8, 2008

Before EASTERBROOK, *Chief Judge*, and RIPPLE and WOOD,
*Circuit Judges*.

RIPPLE, *Circuit Judge.* David Arredondo was convicted
by a Wisconsin jury of first-degree intentional homicide
and second-degree sexual assault. The Wisconsin trial
court sentenced him to life without the possibility of parole
on the homicide charge and twenty years' consecutive
imprisonment on the sexual assault charge. After ex-
hausting his direct and collateral remedies in state court,

Mr. Arredondo filed in the district court a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied his petition. Mr. Arredondo timely filed a notice of appeal and obtained a certificate of appealability.

For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

On May 8, 1997, Desiree Klamann's naked body was found wrapped in a comforter in a garbage dumpster. Klamann was last seen alive, in the company of Mr. Arredondo, on May 4, 1997. The police discovered Mr. Arredondo's semen on the comforter. The police searched the apartment of Thomas Garza, where Mr. Arredondo had stayed with some frequency. They discovered that someone recently had painted the lower half of the walls of Mr. Arredondo's bedroom, but the police nevertheless discovered blood, later determined to be Klamann's, on one of the moldings.

Thereafter, Mr. Arredondo was charged with the murder and sexual assault of Klamann, and he pleaded not guilty. At trial, the State called several witnesses, including Thomas Garza. Garza testified that, on May 4, 1997, he returned to his apartment at 9:30 or 9:45 p.m. While Garza was in the kitchen, he observed Mr. Arredondo run naked from his bedroom to the bathroom.

Garza asked Mr. Arredondo what was going on, and Mr. Arredondo responded that he had to go to the bathroom and could not wait. Afterwards, both Mr. Arredondo and Garza went to their respective bedrooms. Garza was watching television, and he fell asleep. He testified that he heard a woman's voice while he was sleeping, but he could not be sure whether the voice had come from Mr. Arredondo's bedroom because the television had remained on.

The State also called as a witness Kurt Moederndorfer, Mr. Arredondo's former cellmate at the Milwaukee County Jail. Moederndorfer testified that Mr. Arredondo had told him about the Klamann murder. According to Moederndorfer, Mr. Arredondo met a woman at the Cinco de Mayo festival, and she and Mr. Arredondo spent the day drinking together. Moederndorfer testified that Mr. Arredondo had told him that he had convinced the woman to go home with him, took her into his bedroom and made sexual advances toward her. When the woman resisted, Mr. Arredondo told Moederndorfer that he (Mr. Arredondo) had grabbed her by the throat, choked her and forced her to have sexual intercourse with him. Moederndorfer testified that he had asked Mr. Arredondo whether the police had any evidence of the crime, and Mr. Arredondo replied that he had painted the walls and disposed of the mattress and an old rug in a dumpster.

After the State rested, the trial court excused the jury and engaged in the following colloquy with Mr. Arredondo and his counsel regarding whether Mr. Arredondo would testify. We set forth that colloquy in its entirety because it is so central to our decision:

THE COURT:  . . . . It is my understanding the defense has two very brief witnesses to present before lunch and then the defendant will at that time make a decision about testifying. Is that right?

MR. SCHATZ:[1]  That's correct.

THE COURT:  Has any preliminary decision been made in that regard?

MR. WILLIAMS:[2]  Let's make the record before lunch if we can.

THE COURT:  I'd like to so we know what we're doing over the lunch break, so the decision should be made before the lunch break. It is my understanding the defendant has elected not to testify although wants [sic] to reserve the right to change after these two witnesses testify. Is that right?

MR. SCHATZ:  The defendant's elected not to testify, Your Honor.

THE COURT:  And that's a definite decision?

MR. SCHATZ:  That's a definite decision. I would say 99% definite. I don't expect

---

[1]  Mr. Arredondo's counsel.

[2]  The prosecutor.

anything from these two witnesses that would change his mind, but you never know.

THE COURT:     We can address it again after the witnesses testify, but let me confirm with you, Mr. Schatz, that you have discussed the defendant's options with him in that regard.

MR. SCHATZ:     I have, Your Honor.

R.15 at 2-3. The court then questioned Mr. Arredondo as follows:

THE COURT:     And Mr. Arredondo, I need to confirm with you that you have discussed your decision regarding testifying in this case with your counsel and the options that you have in that regard. You have done so?

DEFENDANT:     Yes, Your Honor.

THE COURT:     You understand that you have an absolute constitutional right not to testify in this case and if you decide, as evidently you have decided, not to testify in this case, the jury will be instructed that they cannot hold that against you. They cannot draw any conclusions from that. Do you understand?

DEFENDANT:     Yes, Your Honor.

THE COURT:     Do you also understand, Mr. Arredondo, that you have a corresponding right to testify and take the witness stand in your own defense. If you do that, you would be subjecting yourself to cross-examination. Do you recognize that as well?

DEFENDANT:     Yes, Your Honor.

THE COURT:     Knowing that you have these corresponding rights and how they apply here and in consultation with your counsel, you have made the decision not to testify in this case, correct?

DEFENDANT:     Yes, Your Honor.

THE COURT:     And although that decision has been made in consultation with your counsel, it is nonetheless, your own decision; is that correct?

DEFENDANT:     Yes, Your Honor.

THE COURT:     All right. Let's proceed.

R.15 at 3-4.

Mr. Arredondo then presented two witnesses after which the defense rested. The court made no further inquiry regarding whether Mr. Arredondo would testify. The prosecutor indicated that the State would not

present rebuttal testimony. The court then advised the jury that the evidentiary phase of the trial was complete and recessed for lunch. Immediately after lunch, however, Mr. Arredondo advised the court that he wished to testify:

THE COURT:     All right. The record should reflect we are now back on the record. . . .

DEFENDANT:     Your Honor, excuse me, Your Honor. I did not understand very well about when you were asking me the questions. My attorney advised me to say yes, but I didn't understand the question that I was yes-ing to when we ended about an hour or two hours ago.

                . . . .

THE COURT:     You're changing your mind about your decision to testify?

DEFENDANT:     Yes, ma'am.

                . . . .

DEFENDANT:     Yes, I did not understand. When you were asking me about the rights or whatever about testify-ing—

THE COURT:     Right.

DEFENDANT:     I did not understand. And I need to take that back, the yes answer that I gave you and tell you no,

I do need to testify because the only one that can defend David Arredondo today is David Arredondo.

THE COURT:     Have you talked to your attorney about this?

DEFENDANT:     I told him and he said no, I could not, but we had an argument earlier this afternoon when I was telling him about it, and he said he didn't give a shit what I did at this point, and I took it as he was not letting me understand what he was coming from.

THE COURT:     All right. Mr. Schatz.

MR. SCHATZ:    Your Honor, that's entirely false. Since the end of court and, of course, I can't discuss whatever Mr. Arredondo and I discussed in confidence. We have discussed quite a bit about whether he would take the stand and testify or not. I told him what the ramifications would be. We discussed it quite a bit this morning in closed quarters even during the trial. All I can say is Mr. Arredondo made the decision not to testify. I concur in that decision—

DEFENDANT: With his help, Your Honor. He told me you're not testifying and I was confused. I did not know— I did not understand, ma'am.

THE COURT: I don't want to get involved or in the middle of a dispute between attorney and client, but I need to make a record of what has transpired. Evidently you have changed your mind at this point in your decision not to testify in this case. Evidently that's also against advice of counsel apparently, and I don't know if the state has a position on that.

MR. WILLIAMS: They rested.

THE COURT: True.

MR. SCHATZ: That's right. And all if [sic] can say is, Your Honor, I rendered my advice, my professional advice to Mr. Arredondo not to testify. This is not something that just came about this morning. This is something which has been—which we have discussed—which we have discussed throughout my representation with him and throughout the day and throughout yesterday.

Regarding Mr. Arredondo not understanding or that he never saw me again after, your bailiffs can certainly—your bailiffs can certainly attest to the fact that after we broke this morning, I was in the back with Mr. Arredondo while he was in the bullpen. We met back there this morning after we broke for maybe 20 minutes, half an hour. I fully explained everything to him at that point as far as whatever questions he may have. I believe I've answered all the questions.

Regarding lesser included offenses, as was stated earlier, I don't believe there is anything in the record to justify—

THE COURT:     I don't think that's the issue at this point.

DEFENDANT:     I did not understand—

MR. WILLIAMS:  What maybe I would ask is we take a break and Mr. Schatz and Mr. Arredondo go back and see if they can resolve their difference.

THE COURT:     That's what I would suggest. Why don't you have a brief conversation in the bullpen about this issue, and

counsel and I will talk about the change in this turn of events. We'll be in recess.

(Long recess)

THE COURT: All right. We're back on the record. . . . I need to confirm with you, Mr. Arredondo, whether it is still your intention to attempt to revoke your previously made decision to not testify in this case. Is that still your intention at this time?

DEFENDANT: It is my intention to testify, yes, Your Honor.

THE COURT: All right. And you discussed this further during this recess with your counsel, Mr. Schatz; is that correct?

DEFENDANT: Yes, Your Honor.

THE COURT: All right. Mr. Schatz, is that correct, you discussed that with your client?

MR. SCHATZ: Yes, it is, Your Honor. He did express his desire to me to essentially reopen the defense case and be allowed to testify.

THE COURT: All right. I need to inquire about certain things, first of all. I have

during this recess attempted to find some Wisconsin case law on this situation, and I have not been successful in doing so. I haven't found any case law that governs an attempt to revoke a previously made decision not to testify, and I don't believe there is any Wisconsin case law on that point based on my limited and brief search over the course of the last 45 minutes or so. In any event, it seems to me to be controlled by a couple different factors.

Number one, whether the defendant's previously announced decision was knowing and voluntary and was a knowing and voluntary waiver of the constitutional right to testify.

And number two, what prejudice there would be to the state and the system if allowing the defendant—if the court allowed the defendant to revoke that decision. So it depends on those various factors.

I have also had the court reporter transcribe the discussion and colloquy on the record that I had with the defendant concerning his right

to testify or not to testify in this case, and I have also taken the liberty of consulting the previous transcript of the trial in the Kim Strandberg episode at which the defendant elected to testify, and I had practically the same discussion and colloquy on the record with the defendant at that time.

During the course of this trial when I did elicit from the defendant his decision in this regard, he made an unequivocal decision that it was his decision not to testify in this case and that he made it in consultation with counsel, but it was, nonetheless, his decision, and he understood what his options were in that regard. There was a qualifier put on that by counsel having to do with this being a 99 percent decision, that he might change his mind after the two defense witnesses testify, but that wasn't anticipated.

The record should reflect that I observed a conversation between attorney and client after the two defense witnesses testified which appeared to be a conversation con-

cerning the defendant's previously made decision not to testify and whether that was still the case, and then the record reflects that the defense rested. I need to confirm, Mr. Schatz, that that is indeed what was occurring during that very brief off the record consultation between you and Mr. Arredondo before you rested your case. Is that correct?

MR. SCHATZ:    Before I answer that, Your Honor, the brief conversation Mr. Arredondo and I did have was still governed at that point by attorney-client privilege, so I can, if that privilege, if that privilege for that very limited perhaps 15, 20 second discussion or whatever it was is waived, I can state for the record what it was about.

THE COURT:    Mr. Arredondo? Well, I would construe the present situation to constitute a per se waiver of the attorney-client privilege for this limited purpose. The defendant is maintaining at this time that he didn't know what he was doing when he waived his right to testify in this case, and so in that sense we

are in almost a postconviction type posture in which a waiver of the attorney-client privilege for the limited purpose of inquiring into what transpired between attorney and client is deemed made by the defendant, so that is the situation I will find that we are in and ask you to confirm or deny, whichever is the case, that that is indeed what was discussed.

MR. SCHATZ:    I will consider that to be a court order. Yes, after the last defense witness testified, and I believe that was Mr. Erwine, and he left the witness stand just before resting, I did make a final confirmation with Mr. Arredondo. I asked him this is the last chance, are you sure you do not want to testify. He said, "I don't want to testify." At that point we rested.

THE COURT:    All right. With that supplementation of the record, I need to know, Mr. Williams, what your situation is as far as prejudice to the state by the defense attempt or the defendant's attempt to re-open his case and take the witness stand in his own defense in this case.

MR. WILLIAMS:    The witnesses were released, and whether they can be relocated or not, I believe they probably could. I don't know what difficulty there would be. I know we've relocated some of the witnesses, but that's basically the posture we're in. We released the witnesses at noon.

THE COURT:    So at this point not all of the potential rebuttal witnesses have been relocated.

MR. WILLIAMS:    All of them have not been relocated at this point.

THE COURT:    All right. And it was my understanding that there would be upwards of 10, perhaps as many as 15 rebuttal witnesses.

MR. WILLIAMS:    The possibility exists of about 10 rebuttal witnesses.

THE COURT:    All right. It also should be noted that we have a sequestered jury in this case which now has been kept waiting in the jury room for the totality of the afternoon so for almost three and a half hours while these issues were discussed and while we were preparing jury instructions to proceed to the final phase of the case, so that's also a significant factor.

Based on my review of the transcript of this proceeding and what the defendant indicated to me in a very unequivocal fashion was his decision and his firm decision not to testify in this case made in consultation with counsel and with the full awareness of all his options in that regard, and based on my review of the transcript of his prior trial where he made a different sort of decision but based on similar consultation with counsel and a similar colloquy with me concerning that issue, and based on what has just been made as a supplementation of the record by Mr. Schatz as to what transpired between attorney and client before the defense finally rested its case in this matter, I will find the defendant made a knowing and voluntary and irrevocable decision not to testify in this case, and his request to reopen his case in order to take the witness stand and testify in his own defense is denied. This is also based on the substantial prejudice that would exist to the state and the system and the sequestered jury in order to reopen the case at

|  |  |
|---|---|
|  | this time. I think the defendant knew full well what he was doing— |
| DEFENDANT: | You're wrong, Your Honor. I did not know. |
| THE COURT: | His decision to testify or not to testify in this case, that decision is not capable of being revoked, so your request, Mr. Arredondo, in this regard is denied. It is, however, too late in the day to proceed with closing arguments, so we will recess until 9 o'clock tomorrow morning at which time we will proceed with instructions and closings. |
| MR. SCHATZ: | One thing for the record, Your Honor, before we close. |
| DEFENDANT: | Ineffective counsel. |
| MR. SCHATZ: | My client did have one concern, and just for the record, all chambers conferences between Mr. Williams, myself, and Your Honor have been doing nothing more than discussing issues of law, jury instructions and the like. Do you concur, Mr. Williams? |
| MR. WILLIAMS: | Yes. |

MR. SCHATZ:       And I imagine you concur, Your Honor.

THE COURT:        Yes, we have been spending this time or I have been spending this time looking for Wisconsin case law for guidance on this issue and weighing the options and the issue of whether or not the defendant knowingly and voluntarily made his decision not to testify in this case and also considering the prejudice that existed to the state, and the decision's been made. We'll see you tomorrow morning at 9 o'clock to proceed with the final phase of the trial.

MR. WILLIAMS:     The only other thing, I think Mr.— I don't know if the court would deem it a waiver for time privileges, but Mr. Schatz I think could perhaps go through a history of how he's advised the defendant of his right to testify.

THE COURT:        We can do that briefly. I don't think it's substantially necessary. It's something that may or may not be litigated at a later date, but if you wish to make a brief record of when you've discussed this issue with him.

MR. SCHATZ:      Well, Your Honor, the only thing—

DEFENDANT:       Never came and visited me. How is he gonna—

MR. SCHATZ:      Your Honor, in response to Mr. Arredondo's statement, there are certainly records at the Milwaukee County Jail. People have to show identification to come in and out. Attorney visits, the like—

DEFENDANT:       Ineffective counsel, that's what it is.

MR. SCHATZ:      I have absolutely no doubt that if anybody were to check the jail records, they will find a record of every visit I have made to Mr. Arredondo. I have received collect telephone calls at my phone from Mr. Arredondo. We have discussed this entire week regarding his decision of whether to testify, whether not to testify. I have offered my professional opinion that I don't believe he should. I have advised him—

DEFENDANT:       Told me not to today, not to testify. I wanted to testify. He told me not to testify. He says no, they're gonna find you guilty, and I don't want to swear in the courtroom,

|                | but that's what he said to me today, Your Honor. I wanted to testify and tell the Klamann family and the jury that I'm not guilty of this. I'm sorry, Your Honor, but you're being very unfair denying it. |
|----------------|----------------|
| THE COURT:     | Anything else, Mr. Schatz? |
| MR. SCHATZ:    | Very briefly. Every time I have discussed Mr. Arredondo's decision to testify as well as options— |
| DEFENDANT:     | He lies. Lies. Lies. |
| MR. SCHATZ:    | —as well as options any criminal defendant has, it's always been my practice, however, long I have practiced law, 13 years now, I have explained to every single client there are certain decisions which only you can make in any type of a criminal trial. I will give you my advice of what I feel you should do and tell you why—what I base my advice upon, but the ultimate decision is yours, and that's what happened in this— |
| DEFENDANT:     | Why you got to continue to lie in front of— |
| THE COURT:     | The record's been made. We're in recess until 9 o'clock tomorrow morning. |

DEFENDANT:     Lies. I'm innocent. And I can prove it to you guys.

R.15 at 4-10.

The next morning, Mr. Arredondo's counsel stated that Craig Pradarelli, a private investigator, had joined him in court:

THE COURT:     It's my understanding that the reason that he is presently at counsel table is because your [sic] wish to supplement the record, Mr. Schatz—

MR. SCHATZ:    That's correct.

THE COURT:     —that we made yesterday afternoon, in particular concerning certain accusations at the level of preparedness and the amount of time that was put to the preparation of this case in particular as it relates to his decision to testify or not to testify.

MR. SCHATZ:    That's correct.

THE COURT:     Go ahead.

MR. SCHATZ:    First, Your Honor, as I stated, Mr. Pradarelli was approved and appointed by the state public defender's office to assist me on this case.

It's my understanding that Mr. Pradarelli met with Mr. Arredondo

twice during the preparation of
this case. I also met with him
twice during the preparation. It's
my understanding of course that
Mr. Arredondo gave whatever
certain information to Mr.
Pradarelli which he did follow up
on; that Mr. Pradarelli gave me all
the results of his investigation
and his follow-up and they were
factored into the trial preparation
and assistance in this case.

I would also state for the record
that besides meeting with Mr.
Arredondo twice, special visits in
the jail, I also met with him when-
ever we were here in court; I be-
lieve there were three court ap-
pearances prior to trial here in
court. I've also spoken to him via
collect telephone calls both in my
office and at my home, I don't
know the exact number of times; a
fair estimate, I would say about a
dozen if not more. Mr. Arredondo
and I have discussed in detail over
the course of preparing for this
trial in detail many, many times
about his right to testify, his right
not to testify. Specifically more
this week during the trial, we have

discussed every day his right to testify.

I believe that based on—Well, based on information that Mr. Williams offered to me earlier in the week, which was in fact true, certain evidence that he may or may not use and then he told me he made a decision not to use, we've—I've discussed with Mr. Arredondo and I believe it was as early as Tuesday or Wednesday this week that the decision was made not to testify. Even though every day I still discussed with him his right to testify, that decision did not change since Tuesday or Wednesday of this week, and as stated yesterday on the record at the end of the day just before the defense rested, you did note that Mr. Arredondo and I had a brief conference, a brief, a brief conference here at counsel table. I confirmed with him, I said "Essentially this is your last chance. Do your [sic] or do you not want to testify." He indicated he did not want to testify—

DEFENDANT:        That's a lie.

MR. SCHATZ:      —then we rested.

. . . .

THE COURT:      Mr. Williams, any further record you wish to make on this?

MR. WILLIAMS:   No.

THE COURT:      I think the record should be very clear, to the extent it wasn't made clear yesterday, that I regard Mr. Arredondo's conduct yesterday afternoon on this issue of whether to testify or not to testify simply another attempt to manipulate rather than any change of heart or any misunderstanding.

There is no support for your claim, Mr. Arredondo, that you misunderstood, and there is no support for your claim that you were doing what your attorney told you and not what you wanted to do. The record fully supports my conclusions in this regard. You told me directly and in an unequivocal fashion that you did not wish to testify.

DEFENDANT:      Let me prove my opinions to—

THE COURT:      Mr. Arredondo, you may not interrupt me nor anyone else in this

courtroom or I will have to eject you from the courtroom if you continue with this behavior. Is that clear?

DEFENDANT:     Yes, Your Honor.

THE COURT:     There was no honest change of heart in this case. This is an attempt to manipulate the justice system.

DEFENDANT:     No.

THE COURT:     I'm not through. If you interrupt again, I will eject you from the courtroom.

The defendant was fully advised of his rights in this regard both by me and by his counsel. He was advised of the same rights in the prior trial involving Kim Strandberg who testified in this case. He represented in the prior trial a full understanding of his rights to testify or not to testify in that matter. His attorney represented on the record in that matter that he fully understood his rights and options in that regard, and I am fully satisfied that the defendant understands what the situation was, understood what the

situation was, made an informed, knowing and voluntary decision in that regard, which under the circumstance can lead only to the conclusion that this is theatrics and that this is playing for the cameras, perhaps, and that this is a gross attempt to manipulate the system and I cannot allow it under the circumstances. This is not simply an honest change of heart under any stretch of the imagination.

So the record should be very clear on that point for any future appellate purposes.

Anything anyone else wishes to add?

MR. WILLIAMS:    No, Judge.

MR. SCHATZ:    No, Your Honor.

R.15 at 10-13.

A jury found Mr. Arredondo guilty of first-degree intentional homicide and second-degree sexual assault. The Wisconsin trial court sentenced him to life without the possibility of parole on the homicide charge and twenty years' consecutive imprisonment on the sexual assault charge.

**B.**

Mr. Arredondo filed this action under 28 U.S.C. § 2254. As relevant here, his petition claims that he was deprived of his constitutional right to testify and that his trial counsel was ineffective.

The district court determined that the Court of Appeals of Wisconsin had not acted contrary to, or unreasonably applied, clearly established Supreme Court precedent in holding that Mr. Arredondo had waived his right to testify. The district court then determined that the Wisconsin appellate court also had not unreasonably applied clearly established federal law, *Rock v. Arkansas*, 483 U.S. 44 (1987), in holding that the trial court had not erred when it refused to permit Mr. Arredondo to retract his waiver. It then determined that, even if the Wisconsin appellate court had erred, the error was harmless.

Mr. Arredondo requested a certificate of appealability on all of the issues that he had raised before the district court. The district court, however, determined that only two issues satisfied 28 U.S.C. § 2253(c). First, whether the Court of Appeals of Wisconsin unreasonably applied *Rock* when it found that Mr. Arredondo's right to testify had not been violated when the trial court declined his request to reopen the case so that he could testify. Second, whether such error is subject to harmless error analysis.

Mr. Arredondo timely appealed to this court.

## II

## DISCUSSION

Mr. Arredondo raises three issues on appeal. First, he contends that the Wisconsin appellate court unreasonably applied clearly established Supreme Court precedent when it determined that he had knowingly and voluntarily waived his right to testify. Second, Mr. Arredondo contends that the appellate court unreasonably applied *Rock* when it refused to allow him to retract that waiver. Third, Mr. Arredondo claims that the district court erred in applying the harmless error doctrine to a violation of a defendant's right to testify.

## A.

The district court did not grant Mr. Arredondo a certificate of appealability on the issue of whether the Wisconsin appellate court's decision that Mr. Arredondo had knowingly and voluntarily waived his right to testify was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Mr. Arredondo has briefed the issue, however, and, in doing so, he has implicitly requested that this court amend the certificate. *See Sylvester v. Hanks*, 140 F.3d 713, 715 (7th Cir. 1998).

The standard governing a court's decision to grant a certificate of appealability is set forth in 28 U.S.C. § 2253(c)(2). A court may grant a certificate if the applicant makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). An applicant has made a "substantial showing" where "reasonable

jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). We agree with the district court that Mr. Arredondo has not met this standard with respect to his claim that his waiver of the right to testify was not knowing and voluntary.

As the district court pointed out, the Supreme Court of the United States never has held that a trial court must engage in a personal colloquy with a defendant to determine whether he wishes to testify or that a waiver of the right to testify must occur formally on the record. Indeed, in *United States v. Brimberry*, 961 F.2d 1286 (7th Cir. 1992), we held that "courts have no affirmative duty to determine whether a defendant's silence is the result of a knowing and voluntary decision not to testify." *Id.* at 1289-90 (quoting *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991) (collecting cases)). Here, the trial court, acting within its discretion, did engage Mr. Arredondo in a colloquy to determine whether he voluntarily and knowingly was waiving his right to testify. After Mr. Arredondo satisfied the trial court that his waiver was entered voluntarily and knowingly, no clearly established Supreme Court precedent required the court to engage in a second colloquy immediately after the two last witnesses finished testifying and before the defense rested. Therefore, Mr. Arredondo cannot show that reasonable jurists could debate whether the Wisconsin courts acted "contrary to" clearly established Supreme

Court precedent by not undertaking a second personal colloquy with him to determine whether he wished to waive his right to testify. *See* 28 U.S.C. § 2254(d)(1).

Mr. Arredondo nevertheless contends that the Wisconsin courts unreasonably applied *Brady v. United States*, 397 U.S. 742, 748 (1970), because the record establishes that he did not knowingly and voluntarily waive his right to testify. In support of this contention, Mr. Arredondo notes that, during the colloquy with the Wisconsin trial court, his counsel, Mr. Schatz, explained to the trial court that, although Mr. Arredondo's decision not to testify was nearly definite, there was a possibility that he would change his mind after the defense presented its two final witnesses; the trial court then stated that it would revisit the issue. From this colloquy, Mr. Arredondo explains, it is evident that he believed that any waiver of his right was conditional. Because the trial court never revisited the issue, Mr. Arredondo asserts that he did not know that his waiver, prior to the presentation of the last two witnesses, was final.

Mr. Arredondo's contention that he believed that any waiver of his right to testify was conditional is contradicted by the statements made by Mr. Arredondo's counsel to the trial court. Specifically, the trial court noted on the record that it had "observed a conversation between attorney and client after the two defense witnesses testified which appeared to be a conversation concerning the defendant's previously made decision not to testify and whether that was still the case, and then the record reflects that the defense rested." R.15 at 7. After

the trial court determined that it would consider Mr. Arredondo's position as an implicit waiver of the attorney-client relationship with respect to this conversation, Mr. Schatz confirmed: "[A]fter the last defense witness testified, and I believe that was Mr. Erwine, and he left the witness stand just before resting, I did make a final confirmation with Mr. Arredondo. I asked him this is the last chance, are you sure you do not want to testify. He said, 'I don't want to testify.' At that point [the defense] rested." *Id.* The trial court's observations, combined with his counsel's statements, undermine Mr. Arredondo's claim that he did not knowingly and voluntarily waive his right to testify or that he understood that waiver to be conditional. Indeed, Mr. Schatz's statements on the record indicate that he explained to Mr. Arredondo that this was Mr. Arredondo's "last chance" and asked whether Mr. Arredondo was "sure" that he did not want to testify. *Id.* Given this explanation from counsel, which the Wisconsin trial court credited, we cannot conclude that "reasonable jurists could debate whether" Mr. Arredondo's petition on this issue should have been resolved in a different manner. *Slack*, 529 U.S. at 484.

Mr. Arredondo also contends that "[g]iven his strong disagreements with trial counsel as represented in the record regarding his right to testify, Petitioner had to count on addressing his right to testify with the court as promised rather than addressing it through his attorney." Appellant's Br. at 27. Prior to the defense resting, however, Mr. Arredondo never voiced to the trial court any disagreement with counsel regarding his right to

testify. In fact, prior to the recess, the trial court engaged in a colloquy with Mr. Arredondo. The court informed him that he had a "right to testify and take the witness stand in [his] own defense" and asked him whether the decision not to testify was his own decision despite the fact that it had been made in consultation with counsel. R.15 at 3. Mr. Arredondo responded that the decision not to testify was his own and did not inform the trial court of any conflict with his trial counsel regarding that decision. Therefore, prior to the recess, the Wisconsin trial court had no reason to know that there was a disagreement between Mr. Arredondo and his trial counsel regarding Mr. Arredondo's right to testify.

Moreover, although the trial court was made aware of a disagreement after the recess, Mr. Arredondo's contention ultimately is reduced to an issue of credibility. The trial court's factual findings and the trial transcript itself undermine Mr. Arredondo's contention that he believed that his waiver of the right to testify had been conditional. The Wisconsin trial court determined that Mr. Arredondo was attempting to manipulate the proceeding rather than laboring under a misunderstanding of his right to testify, and the appellate court affirmed the trial court's findings. It is evident from the transcript that this is not a case like *Ward v. Sterns*, 334 F.3d 696, 706-08 (7th Cir. 2003), in which the defendant, who supposedly had waived his right to testify, had mental deficiencies. Mr. Arredondo comes across as competent, and his numerous verbal exchanges with the trial court indicate that he has a fair command of the English language. Mr. Arredondo, in short, cannot rebut the state court's factual

finding that he knowingly and voluntarily waived his right to testify. *See* 28 U.S.C. § 2254(e)(1) (state findings of fact are presumed correct and must be rebutted by clear and convincing evidence).

Mr. Arredondo has not established that reasonable jurists could debate whether the Wisconsin appellate court acted contrary to, or unreasonably applied, clearly established Supreme Court precedent when it determined that the waiver of his right to testify had been knowing and voluntary. Accordingly, we shall not enlarge the certificate of appealability.

## B.

### 1.

We review de novo the district court's denial of a habeas petition. *Daniels v. Knight*, 476 F.3d 426, 433 (7th Cir. 2007). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we may grant habeas relief only if the state court's "decision was contrary to, or involved an unreasonable application of, Supreme Court precedent," *id.*, or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). To grant habeas relief under the "contrary to" clause, we must find that the state court reached a result opposite to that reached by the Supreme Court on materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000); *Jackson v. Miller*, 260 F.3d 769, 774 (7th Cir. 2001). To obtain relief under the "unreason-

able application" clause, a habeas petitioner must show that the state court's decision unreasonably extended a clearly established Supreme Court precedent to a context where it should not have applied or unreasonably refused to extend such precedent to a context where it should have applied. *Jackson*, 260 F.3d at 774. The state court's factual findings are presumed correct; this presumption can be rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003); *Barrow v. Uchtman*, 398 F.3d 597, 603 (7th Cir. 2005). In short, the state court decision must be "both incorrect *and* unreasonable." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (emphasis in original); *see also Terry Williams*, 529 U.S. at 407-08.

## 2.

Mr. Arredondo submits that the Court of Appeals of Wisconsin unreasonably applied *Rock* in holding that the trial court properly had denied his request to retract the waiver of his right to testify. According to Mr. Arredondo, *Rock* held that "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purpose they are designed to serve." Appellant's Br. at 29 (quoting *Rock*, 483 U.S. at 55-56). Thus, Mr. Arredondo contends, the state court was obliged to ask whether "the interests served" by restricting Mr. Arredondo's testimony "justif[ied] the limitation imposed on [his] right to testify." *Id.* (quoting *Rock*, 483 U.S. at 55-56). Analogizing to this court's decision in *Ortega v. O'Leary*, 843 F.3d 258

(7th Cir. 1988), Mr. Arredondo asserts that the state court's conclusion was objectively unreasonable.

The State, on the other hand, contends that the Supreme Court has not applied *Rock* to circumstances such as those presented by Mr. Arredondo's case. It submits that the rule that *Rock* clearly established is that "states 'may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of [the witness'] testimony.'" Appellee's Br. at 9 (quoting *Rock*, 483 U.S. at 55). Given this reach, the State contends that *Rock* does not control whether or under what circumstances a court, having found properly that a criminal defendant waived his right to testify, must honor a defendant's wish to retract that waiver. Furthermore, the State submits that, in two recent cases, the Supreme Court has cautioned against over-reading its precedent in a habeas context, as Mr. Arredondo seeks to do here. *See Carey v. Musladin*, 127 S. Ct. 649 (2006); *see also Wright v. Van Patten*, 128 S. Ct. 743 (2008) (per curiam).

In *Musladin* and *Van Patten*, the Supreme Court reversed the judgment of two courts of appeals because those courts had extended Supreme Court precedent too far from its original context. In *Musladin*, the issue was whether spectators' conduct in the courtroom had violated a defendant's right to a fair trial. The Ninth Circuit applied the test for state-sponsored courtroom practices to the spectators' conduct and concluded that the defendant's rights had been violated. The Supreme Court reversed. It noted that it never had applied the rule for state-sponsored courtroom practices in the context of spectator conduct. The Court explained:

> Given the lack of holdings from this Court regarding
> the potential prejudicial effect of spectators' courtroom
> conduct of the kind involved here, it cannot be said
> that the state court unreasonably applied clearly
> established Federal law. No holding of this Court
> required the California Court of Appeal to apply the
> test [for state-sponsored courtroom practices] to the
> spectators' conduct here. Therefore, the state court's
> decision was not contrary to or an unreasonable
> application of clearly established federal law.

*Musladin*, 127 S. Ct. at 654 (internal quotation marks and
citation omitted) (alteration omitted).

In *Van Patten*, the Supreme Court had vacated a decision
of this court and remanded in light of *Musladin*. In the
original, vacated decision, we had applied *United States v.
Cronic*, 466 U.S. 648 (1984), which created a narrow excep-
tion to *Strickland v. Washington*[3] that exempted the habeas
petitioner from proving prejudice. One circumstance
warranting treatment under the *Cronic* exception is
when "counsel [is] totally absent, or prevented from
assisting the accused during a critical stage of the proceed-
ing." 466 U.S. at 659 & n.25. In the original, vacated deci-
sion, we applied *Cronic* in a situation where the habeas
petitioner's lawyer was not physically present at the
plea hearing but had participated by teleconference
nonetheless. After the Supreme Court remanded the case,
we again reached the same result. The Supreme Court
reversed. It explained that "[n]o decision of this Court . . .

---

[3]  466 U.S. 668 (1984).

squarely addresses the issue in this case or clearly establishes that *Cronic* should replace *Strickland* in this novel factual context." *Van Patten*, 128 S. Ct. at 746 (citation omitted). The Court further noted that its "precedents do not clearly hold that counsel's participation by speaker phone should be treated as a 'complete denial of counsel,' on par with total absence." *Id.* With these cases in mind and their guidance as to how far Supreme Court precedent may be extended for purposes of section 2254(d), we turn to Mr. Arredondo's contentions.

Mr. Arredondo submits that the Wisconsin appellate court unreasonably applied clearly established Supreme Court precedent in affirming the trial court's decision to deny him the opportunity to retract his waiver of the right to testify. Specifically, Mr. Arredondo argues that the Wisconsin appellate court unreasonably applied the balancing test that the Supreme Court set forth in *Rock*. In *Rock*, the Supreme Court "granted certiorari to consider the constitutionality of Arkansas' *per se* rule excluding a criminal defendant's hypnotically refreshed testimony." 483 U.S. at 49. In addressing this question, the Court recognized that a criminal defendant's right to testify is grounded in the Fifth, Sixth and Fourteenth Amendments, and it emphasized that this right is "fundamental." *Id.* at 51-53. The Court's past precedents, the Justices explained, indicate that, "[j]ust as a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand, it also may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions" of the

witness's testimony. *Id.* at 55. Nevertheless, the Court explained,

> the right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. But restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purpose they are designed to serve. In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on a defendant's constitutional right to testify.

*Id.* at 55-56. The Court went on to conclude that Arkansas' "legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case." *Id.* at 61.

The *Rock* balancing test was articulated in a case, and applied to circumstances, much different from the circumstances in which Mr. Arredondo seeks to employ it. *Rock* involved the constitutionality of a state evidentiary rule that resulted in an arbitrary or disproportionate limitation on the defendant's right to offer testimony in her own behalf. The issue in Mr. Arredondo's case, in contrast, is whether a knowing and voluntary waiver of the right to testify is subject to retraction and, if so, under what circumstances that retraction may be exercised. Certainly, no holding of the Supreme Court *required* the Wisconsin appellate court to apply *Rock*'s balancing test to these circumstances. *See Van Patten*, 128 S. Ct. at 746 ("No decision of this Court . . . squarely addresses the issue in this case or clearly establishes that *Cronic* should

replace *Strickland* in *this novel factual context.*" (emphasis
added)); *Musladin*, 127 S. Ct. at 654 ("No holding of this
Court required the California Court of Appeal to apply the
test [for state-sponsored courtroom practices] to the
spectators' conduct here."); *see Hill v. Wilson*, 519 F.3d 366,
368 (7th Cir. 2008) ("The Supreme Court has held that a
right becomes 'clearly established' only when a course
of decisions has established how the Constitution's
grand generalities apply to a class of situations."). Conse-
quently, we believe that *Rock*, assuming that it is ap-
plicable at all—a determination that this case does not
require us to make—is relevant only at a very high degree
of generality. *See Hill*, 519 F.3d at 368 (noting that the
habeas petitioner was "invok[ing] principles of very
high generality," and rejecting the argument that a state
appellate court had "transgress[ed] any right 'clearly
established' by" the standard of *Musladin* and *Van Patten*).

In addition to the level of generality at which *Rock* is
applicable under these circumstances, we must bear in
mind the proper scope of section 2254's reach. The Su-
preme Court has explained that

> . . . the range of reasonable judgment can depend in
> part on the nature of the relevant rule. If a legal rule is
> specific, the range may be narrow. Applications of the
> rule may be plainly correct or incorrect. Other rules are
> more general, and their meaning must emerge in
> application over the course of time. Applying a
> general standard to a specific case can demand a
> substantial element of judgment. As a result, evaluat-
> ing whether a rule application was unreasonable

> requires considering the rule's specificity. The more
> general the rule, the more leeway courts have in
> reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The Supreme Court in *Rock* established a methodology for reviewing restrictions on a defendant's right to testify, but that methodology calls for the balancing of very general interests. As a result, a state court's application of the *Rock* methodology entails a "substantial element of judgment," and the state court, therefore, is entitled to "more leeway . . . in reaching outcomes in case-by-case determinations." *Id.*

With these principles in mind, we cannot accept Mr. Arredondo's contention that the Wisconsin appellate court's decision was objectively unreasonable. The appellate court affirmed the trial court's refusal to allow Mr. Arredondo to retract his waiver because the retraction would have prejudiced the prosecution and kept the jury longer than expected. More important, the Wisconsin appellate court noted that the trial court had concluded that Mr. Arredondo was engaging in "theatrics" and a "gross attempt to manipulate the system," rather than laboring under a misunderstanding of his right to testify. S.A. at 69. "[T]he trial court also found," explained the Wisconsin appellate court, that Mr. Arredondo had "voluntarily g[iven] up his right to testimony." *Id.* Finally, the appellate court explained that "it is clear from the context of the trial court's statements that the trial court did not mean that [Mr.] Arredondo's decision to waive his right to testify was irrevocable as a matter of law." *Id.*

Given the Supreme Court's explanation of the proper sweep of section 2254's "unreasonable application" clause and given the high level of generality at which the *Rock* methodology is applicable here, the state court's decision cannot be characterized as objectively unreasonable. As the Wisconsin appellate court noted, the trial court had engaged in an extensive colloquy with Mr. Arredondo informing him that he had a constitutional "right to testify and take the witness stand in [his] own defense." R.15 at 3-4. The trial court confirmed that Mr. Arredondo himself had "made the decision not to testify in this case . . . although that decision has been made in consultation with . . . counsel." *Id.* After considering the prejudice to the prosecution and the delay that the retraction would have caused, in combination with its finding that Mr. Arredondo's request to retract his waiver was an attempt at manipulating the trial process, the trial court determined that Mr. Arredondo should not be allowed to retract his waiver. Under these circumstances, we cannot conclude that the Wisconsin appellate court's decision to affirm the trial court's decision was objectively unreasonable.

Mr. Arredondo attempts to cast doubt on the trial court's assessment of the amount of prejudice to the prosecution that would have resulted had he been allowed to retract his waiver. He points out, for example, that the prosecutor had informed the court that, although the State's rebuttal witnesses had been excused, it already had located some of these witnesses and that the other witnesses "probably could" be located. *Id.* at 8. It bears emphasis that, to grant Mr. Arredondo habeas relief

under section 2254(d), it is not sufficient that we would have weighted differently the various interests in conducting de novo the *Rock* balancing test or even that the state appellate court's determination was wrong; Mr. Arredondo must establish that the appellate court's determination was "objectively unreasonable." *Lamon v. Boatwright*, 467 F.3d 1097, 1100 (7th Cir. 2006).

Furthermore, Mr. Arredondo neither explains nor cites any authority as to why the trial court should have limited itself to considering only the prejudice that would have resulted from the failure to locate rebuttal witnesses while ignoring the delay, expense and manpower required to locate these witnesses. In any event, the prosecutor also informed the trial court that there were ten rebuttal witnesses who needed to be relocated and that he did not know how difficult it would be to locate the witnesses who had not been found yet. Finally, the trial court determined that Mr. Arredondo's attempt to retract his waiver had been made in bad faith, and, therefore, the state court did not require an exceedingly weighty justification for denying Mr. Arredondo's request.[4]

---

[4] Because this case arises under 28 U.S.C. § 2254(d), we cannot accept Mr. Arredondo's invitation to engage in the more rigorous review that we undertook in *Ortega v. O'Leary*, 843 F.2d 258 (7th Cir. 1988) (undertaking a plenary review of the state court's decision and "[a]ssuming that the trial court improperly denied [the defendant's] request to testify"). *Ortega* arose prior to Congress' enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), and, therefore, the

(continued...)

Mr. Arredondo also criticizes the trial court's failure to consider the testimony that he would have offered had he been allowed to retract his waiver. Mr. Arredondo, however, made no attempt to inform the court as to what the substance of his testimony would have been. Indeed, he only stated, "I do need to testify because the only one that can defend David Arredondo today is David Arredondo." R.15 at 4-10. Moreover, given the trial court's finding that Mr. Arredondo had voluntarily and knowingly waived his right to testify, no clearly established Supreme Court precedent required the trial court to conduct another colloquy with Mr. Arredondo specifically to determine what his testimony would have been. We therefore cannot accept Mr. Arredondo's contention

---

[4] (...continued)

court in *Ortega* was at liberty to apply a much more searching standard of review than the one to which AEDPA confines us.

In addition, we note that the state trial court in *Ortega* had not engaged in a colloquy with the defendant to determine whether the defendant had knowingly and voluntarily waived his right to testify and that it had made no findings of fact on that issue. *Id.* at 261 (noting that the "record in this case is devoid of any colloquy between the judge and Ortega on the nature of the waiver" and that "trial courts must take steps to insure that important constitutional rights have been voluntarily and intelligently waived"). In this case, by contrast, the Wisconsin court engaged in a lengthy colloquy on the record with Mr. Arredondo, informing him of his right to testify and determining that Mr. Arredondo's decision not to testify was his own decision despite being made in consultation with counsel.

that the failure of the Wisconsin appellate court to take into account the substance of the testimony that he would have offered constituted an unreasonable application of clearly established Supreme Court precedent.

## Conclusion

Mr. Arredondo has not established that reasonable jurists could debate whether the Wisconsin appellate court acted contrary to, or unreasonably applied, clearly established Supreme Court precedent when it determined that the waiver of his right to testify had been knowing and voluntary. Consequently, we shall not enlarge the certificate of appealability. Moreover, given the Supreme Court's explanation of the proper scope of section 2254's "unreasonable application" clause as well as the high level of generality at which the *Rock* methodology is applicable here, the state court's decision cannot be characterized as objectively unreasonable. Accordingly, the judgment of the district court is affirmed.

AFFIRMED